[No. 1738.]

## JAMES MERCER v. THE STATE.

1. INCEST — CONSENT.— The question of the consent of the female does not necessarily enter into the composition of the offense of incest, but a prosecution for that offense can be maintained upon proof that establishes either her consent or non-consent to the carnal intercourse. See the opinion *in extenso* for a discussion of the principle.

2. SAME — ACCOMPLICE TESTIMONY — CHARGE OF THE COURT.— If the female with whom the incestuous intercourse is alleged to have been had is shown to have knowingly, voluntarily, and with the same intent which actuated the accused, united with him in the commission of the offense, she is an accomplice in the crime, and her uncorroborated testimony is insufficient to support a conviction of the accused. On the other hand, if the evidence shows that, in the commission of the incestuous act, she was the victim of force, threats, fraud or undue influence, so that she did not act voluntarily, and did not join in the commission of the act with the same intent that actuated the accused, then she is not an accomplice, and a conviction might stand even upon her uncorroborated testimony. The charge of the court announcing the law in conformity with this rule was correct, and there was no error in refusing special charges on the subject, requested by the accused.

3 SAME — FACT CASE.— See the opinion and the statement of the case for evi-
dence *held* sufficient to establish the *status* of the prosecuting witness as an
accomplice, and for evidence *held* sufficient to corroborate her testimony
and support the conviction.

4. SAME — PRIVILEGE OF COUNSEL.— See the opinion *in extenso* for circum-
stances under which the prosecuting attorney did not abuse his privilege of
argument.

APPEAL from the District Court of Llano.  Tried below before the
Hon. J. C. Townes.

The indictment was presented in the district court of Llano
county, Texas, on the 14th day of June, 1884. It charged the defend-
ant with the unnatural and revolting crime of incest with his
daughter Sarah, in Llano county, Texas, on the 30th day of June,
1882.  A term of two years in the penitentiary was the penalty im-
posed by the verdict.

Andrew Dodd was the first witness for the State.  He testified
that he and the defendant were brothers-in-law, having married sis-
ters.  He had known the defendant some fifteen or sixteen years.
The defendant's wife, prior to her marriage to the defendant, was
named Nancy A. Redford.  The marriage of the defendant and
Nancy Redford occurred prior to the witness's acquaintance with
either of them.  The witness was also acquainted with Sarah
Vaughn, who was the reputed daughter of the defendant and his
wife Nancy.  The said Sarah married Vaughn some time in 1883.

Cross-examined, the witness testified that he had lived in Llano
county about two years.  He settled at Valley Springs in said
county in June, 1882.  At that time the defendant lived in the lower
part of the county on the Colorado river.  He afterwards moved to
Valley Springs.  Witness had known Sarah Vaughn for the last fif-
teen or sixteen years.  She married Vaughn after the defendant's
removal to Valley Springs.

S. S. Redford, a brother to the defendant's wife, testified for the
State that he had known the defendant since his youth.  The
defendant married his present wife, the witness's sister, Nancy A.
Redford, in Austin county, Texas, about twenty-five years ago.
Witness was present at the marriage ceremony.  The witness was
also acquainted with Sarah Vaughn, the wife of William Vaughn, to
whom she was married in the summer of 1883.  Her maiden name
was Sarah Mercer, and she was the daughter of the defendant and
his wife Nancy A. Mercer.  Sarah gave birth to a child, which is
still living, about a year prior to her marriage to Vaughn.  It was

born in the spring of 1882. If she was ever married before she married Vaughn, the witness never heard of it.

Cross-examined, the witness said that Sarah's child was fourteen or fifteen months old when she married Vaughn. The witness lived in Washington county at the time of Sarah's marriage to Vaughn, and was not present at the celebration of that marriage. He, witness, moved to Llano county in October, 1883, at which time the defendant lived near Valley Springs. Witness lived in the neighborhood of Valley Springs at the time of this trial. Witness was on a visit to Llano county a few days before the marriage of Vaughn and Sarah, and saw Vaughn at the defendant's house. The marriage of Vaughn and Sarah was solemnized at the house of the defendant, according to the witness's understanding. At all events, they were living at his house at the time of this trial. The visit of the witness to Llano county, spoken of, covered some eight or ten days, in the course of which he visited the defendant's house twice. The witness was at the defendant's house once when the defendant lived at the forks of the Llano and Colorado rivers. Sarah's child was an infant in 1882. Vaughn was not at the defendant's house at the time of its birth. The marriage of Vaughn and Sarah occurred in July, 1883.

Mrs. Sarah Vaughn was the next and the principal witness for the State. She testified that she was the wife of T. W. Vaughn, to whom she was married on July 26, 1883. Her maiden name was Sarah Mercer, and the defendant on trial was her father. He was also the father of her child, which was born on the last day of March, 1882. The witness's father, the defendant on trial, had carnal knowledge of her, at the cow pen near his house in Llano county, Texas, about the 13th day of June, 1881, and the infant in the witness's arms was the result of that experiment. The defendant came to the cow pen, where the witness was milking, about dusk on that evening, took hold of the witness, laid her down and introduced his private parts into her private parts, and then told the witness that if she ever reported the occurrence to any one, he would beat her to death. The witness, being afraid of the defendant, submitted through fear.

Cross-examined, the witness stated that she was twenty-four years old at the time of this trial. Witness could not count and had but a poor recollection of dates, and could not say how old she was on the occasion that her father copulated with her, but thought she was about twenty-one years old. She was born on the 1st day of May, but could not say of what year. The particular act of illicit intercourse between the witness and her father now deposed to — the particular

act which resulted in the witness's impregnation — occurred in the evening about dusk on the 30th day of June, 1881, or about that time, at the cow pen, on the defendant's place, at the forks of the Colorado and Llano rivers in Llano county. That cow pen was within fifty yards and in sight of the house. The witness's mother and family were at the house at the time. That family consisted of a sister three years younger than the witness, and then about eighteen years old, and one brother, about fifteen years old. Witness made no outcry. She was engaged in milking when the defendant came to the pen to feed his horse. He said nothing to the witness, but laid her down, subjected her to his desires, and impregnated her. He told her after he had accomplished his purpose that if she ever reported the occurrence to any one he would beat her to death. Witness called no one and made no outcry because she was afraid of the defendant. She knew thoroughly well that she was impregnated by the defendant because she had never had carnal intercourse with any other man.

At the time of her impregnation by the defendant, the witness was a strong, healthy young woman, much accustomed to work. She could not remember that, at the time her father covered her on the evening in question, she said anything to him. She did know, however, that she made several fruitless efforts to push him off. She did not cry out, nor did she make any great resistance, simply because she was afraid to. The witness could not have prevented the defendant from accomplishing his purpose to copulate with her, as she knew, or felt that she knew, he would carry out his threat to beat her to death if she did not submit. The defendant had often beat the witness with great severity. The witness located the date of the act of copulation which impregnated her, by the date of the birth of her child. The result of that night's experience had entailed too much trouble and misery upon the witness to permit her to forget any of its details. It was some time before the witness told any one of the treatment she had received from her father. About four and a half months afterwards, when the fact that she was pregnant could be no longer concealed, the witness divulged the truth regarding her condition and the paternity of her prospective child to her mother. But for her pregnancy the witness did not think she would have confessed having had carnal intercourse with the defendant. She was afraid to make such a confession.

The neighborhood in which the defendant lived at the time he got the witness big with child was comparatively well settled, there

being neighbors residing within the distance of a half a mile, including the families of four of the defendant's brothers. These four families, and the defendant's family, were on visiting terms at the time. The defendant had often had carnal intercourse with the witness prior to the time referred to in the foregoing testimony. The first experience of the kind was in Lee county, when the witness was but thirteen years old. It occurred in the field. The defendant on that occasion took her from her work, took her into the field, and, over her protest, had carnal knowledge of her person. Witness told no one of that occurrence, because she was afraid to do so. She had one uncle on her mother's side living in that neighborhood at that time. From the first time in the field in Lee county as described, until the last time when he got her big, the defendant had criminal intercourse with the witness as often as once a week except during his occasional absences from home. Witness always objected and protested, and the defendant always threatened that unless she submitted and preserved his secret, he would beat her to death, and the witness, firmly believing he would do so, submitted without making outcry. Defendant and his family, including the witness, lived in Lee county about two years. They removed thence to Coryell county, where they remained about one year. Thence they removed to Hays county and remained two years, and from Hays county they removed to Llano county. They remained in Llano county but a short time, when they went to Mr. Hoover's place in Burnet county, where they remained two years. They then returned to Llano county, where they have since resided. During all this time, except when absent from home, the defendant had carnal knowledge of the witness at least once a week. The neighborhoods in which they lived during these years, were all thickly settled.

No one save her father, the defendant, ever had carnal knowledge of the witness prior to her marriage, and no man, save her father, ever proposed improprieties to her. None of her uncles had ever sought her sexual favors. The defendant frequently compelled the witness to attend him in his absences from home, despite her pleading to be excused. On such occasions he would explain to the family that he was lonesome by himself and required company. The defendant was in the habit of beating the witness with great frequency, sometimes almost unmercifully. He chastised the witness much oftener than either of his other two children. Witness had always managed to get along with her mother without collision. When the witness was about eighteen years old she determined upon making an effort to put a stop to the treatment to which the defendant sub-

jected her.   About sundown one evening after she had made this resolve, the defendant directed her to get up early next morning and to meet him behind the corn crib, as he wanted to satisfy his passion.   Witness decided that, being of age, she would venture to disobey the defendant.   She did not get up and repair to the crib as directed, and the defendant called her.   Because the witness refused to comply, the defendant said to her that, if she did not obey, he would take a board to her.   She replied that he had best proceed to do so at once.   Defendant then came to the witness's bed and whipped her severely with a board.   Witness then went into the kitchen and took her seat near the fire.   The defendant followed her and took her by the hair.   Witness's mother and grandmother thereupon interfered and made him desist.   The direction (to meet him at the crib) was given to the witness on the evening before at the cow pen, on Hoover's place in Burnet county.   All of the defendant's family were at home at the time, and D. G. Mercer and his wife were guests at the house.   That house contained a main room in which the defendant and his family, including the witness and her grandmother, slept, and a shed room which was occupied by D. G. Mercer and his wife.

Vaughn and the witness were engaged to be married for two and a half or three years before their marriage, and were so engaged at the time the witness's child was born.   They were married on the 26th day of June, 1883, when the child was past a year old, it having attained its first anniversary on the last day of the preceding March.   Witness's family was much opposed to the witness's marriage to Vaughn.   The witness lived with her father's family from the time of her birth to her marriage, and she and her husband have continued to live there since.   She confessed the paternity of her child to her husband about one month after her marriage to him.   No one attempted to induce the witness to file complaint against the defendant.   Witness was summoned twice by process before she consented to appear as a witness or complainant against the defendant, and was finally placed under bond to compel her attendance.   No one posted her as to what she should swear, nor did any one advise with her as to the conduct of the prosecution.   Witness located the time of her impregnation by the birth of her child, but could not remember the nature of the work at which she was engaged on that day, or on the several days immediately before or after.   She could not remember that the house was visited by any one on that day, or for several days before or after.   She could not call to mind with certainty what she was doing just before or after

that act of copulation.   Her memory as to dates was, as a general rule, very poor, but she was certain that this eventful act of copulation occurred on or about the 30th day of June, 1881.

The witness denied that, when she was four or five months advanced in pregnancy, she told D. G. Mercer and his wife, on the Brantley ranch in Llano county, that she was pregnant by a young man who had fooled her into illicit intercourse.   The defendant promised to treat the witness and her child well, if the witness would conceal his agency in her misfortune.   Witness first told Miss Mary Egger of her experiences with her father while she, witness, lived in Lee county.   During his residence in the forks of the Colorado and Llano rivers, the defendant occasionally had preaching at his house. Four young gentlemen, cousins of the witness on her mother's side, visited the defendant's house two or three weeks after the last act of copulation between witness and her father, and witness went with them to church on one occasion.   Those cousins remained at the house of the defendant about three weeks.   Other young men sometimes visited the witness.   The various acts of copulation spoken of took place at different places — sometimes near the house, and sometimes in the fields distant from the house.

Re-examined, the witness stated that, after she confessed the truth to her mother, her mother told the defendant that she, the witness, was pregnant, and that he, the defendant, was the father of the child.   The defendant admitted that he was guilty, got his gun, said that he would blow out his brains, and that the witness ought to be willing to go to the grave with him.   He left home twice, avowing his intention of leaving the country.   The first time he remained away about a week; the second time about ten or twelve days.   The witness did not make the complaint upon which the defendant was arrested.   J. M. Bourland arrested the defendant.   The witness was subpœnaed as a witness, but, failing to attend, she was attached and put under bond.   The witness's illicit intercourse with the defendant was not voluntary but was exacted of her by the defendant, operating upon her fears.

Re-cross-examined, the witness stated that when the defendant left home on the two occasions referred to in her re-direct examination, he complained that he was unable to do his customary work, and was going to hunt work he could do.   He told the witness's mother, in the presence and hearing of the witness, that he was going to leave as he was in momentary expectation of arrest.   He was arrested on the eve of departure.   He turned everything over to his son Tom Mercer.

J. M. Bourland testified, for the State, that he had a distinct recollection of the circumstances attending the arrest of the defendant. The complaint was made by the witness on information that he received. He also arrested the defendant, making the arrest about sunrise, one hundred yards below his cow pen. Mrs. Vaughn was not before the justice at all, with reference to the complaint. She was subpœnaed as a witness. Refusing to obey the subpœna, she was attached. Defendant was on foot when arrested. He had no arms on his person.

Henry Harris testified, for the State, that he had a conversation with the defendant, in the course of which the defendant told him that Dodd, Woods, Redford and Barnet took upon themselves the trouble of going to Mason county to procure a witness to swear out a complaint against him on account of that "scrape at his house." This conversation occurred in December, 1883.

Cross-examined, the witness stated that the conversation referred to took place between himself and the defendant in the course of a ride. Defendant remarked that the parties named were doing him a wrong. Witness had known the defendant for about fifteen years. During this time, and until this charge was brought against him, his reputation for morality had been good. Defendant was quite a poor man. At this point the State rested.

D. G. Mercer, a brother to the defendant, was the first witness introduced in his behalf. He testified that, about seven years before this trial, when the defendant lived on the Hoover place, in Burnet county, he, witness, his wife and family, paid him a visit of about two weeks' duration. Sarah Vaughn, then Sarah Mercer, was at that time about eighteen years old. Sarah's father, the defendant, whipped her on the third morning after the witness's arrival. Witness distinctly heard the defendant call Sarah two or three times to get up and prepare breakfast, and knew positively that he whipped her solely because she did not obey. He struck her not exceeding two or three blows with the fire-board. The house was such a house as was described by Sarah in her testimony, and the inmates were disposed as she stated. Witness's mother, the grandmother of Sarah, interfered and prevented the defendant from further chastising the girl. The defendant habitually treated Sarah well, so far as the witness knew, and chastised her only when she disobeyed him. So far as the witness could judge, Sarah appeared more attached to the defendant than did any of his other children. She ruled the place, and exerted more absolute control than did her mother. Defendant's treatment of his family was generally good.

Witness knew that Sarah always pleaded for permission to attend her father in his trips from home, and generally managed to provoke disturbance if she was not allowed to go. In October, 1881, when Sarah was some three or four months advanced in pregnancy, she told the witness and his wife, at their home on the Brantley ranche, that a young man had drugged her, impregnated her and run off.

Cross-examined, the witness stated that he did not leave the country immediately after the defendant's examining trial because of the nature of his testimony on that trial, which was the same as his present testimony. He did not leave the country at all, just after that trial. On Sunday, from church near Valley Springs, witness sent word by Jay Harris to the defendant to leave home, as he had heard of a purpose to arrest him.

Mrs. D. G. Mercer, the wife of the last witness, testified for the defense that she had known the defendant and his family for the last thirteen years. Witness and her husband lived on the Brantley ranche in Llano county, in October, 1881. About that time witness had a conversation with Sarah, who was then four or five months advanced in pregnancy, about her condition. Sarah said that she was in a family way by a young man to whom she was engaged, and who had drugged her to accomplish his purpose, and then run away. Sarah said that the engagement still existed, and that she might yet marry the young man. Witness and her husband were at the defendant's house on the Hoover place in Burnet county, when the defendant whipped his daughter with a fire-board. The defendant whipped her because she refused to get up and prepare breakfast. He did not drag her out of bed by the hair, or into the kitchen by the hair. During the twelve months that witness lived in the defendant's family, she always found the defendant kind and considerate to his wife and children. Sarah ruled the place, and was afraid of nothing.

Cross-examined, the witness stated that, on the morning defendant whipped Sarah as described, she, witness, was in bed in the side-room. Sarah's grandmother interfered in her behalf and put a stop to the whipping. If she, the grandmother, took the board away from defendant, witness did not know it. If defendant caught Sarah by the hair, witness did not know it — she could not see into Sarah's room. Sarah's statements as to the paternity of her child were voluntarily made by her.

R. Hoover testified, for the defense, that he lived near the Colorado river, in Burnet county. He had known the defendant about eight

years. Defendant first moved to a point on the river opposite the witness's place, and then across to the witness's place. Witness knew him and his family, including Sarah, quite well. He knew that the defendant always treated his family, including the said Sarah, with marked kindness and consideration. He and all of his family, Sarah included, were hard-working, industrious people. Defendant and his family got along together about as well as ordinary families generally do. The defendant, so far as the witness knew, stood well in the community. He lived within three or four hundred yards of the witness's residence. Witness was often at his house. It was the impression of the witness, based upon his observation, that Sarah did pretty much as she pleased about home. Witness had never known the defendant to whip his daughter Sarah, but could not say that he did not. Witness was in no wise related to any of the parties involved in this trouble. The defendant and his family went about but little. The girls went out but seldom, unaccompanied by some other member of the family. Defendant always appeared particular and jealous of the character of his family, and always sustained a good reputation himself for virtue and morality.

John Sessum was the next witness for the defense. He testified that during the eight or ten years he had known the defendant his reputation for morality had been good.

Thomas Mercer, the son of the defendant and the brother of Sarah Vaughn, testified for the defense that the defendant habitually treated his children well. He never punished Sarah any more than he did his other children. He never whipped her with what could be termed severity. Sarah generally conducted herself about the house as she pleased, and of the children she was much the most difficult to control. Witness lived with his father, the defendant, until his arrest. He left home on the day after the arrest. Sarah lived at the defendant's house after her marriage to Vaughn, and continued to live there up to the time of the defendant's arrest. Witness heard of this charge against his father a few days before his arrest. He heard the first of it after the Redfords, Dodds and Woods moved into the neighborhood. Witness was present when defendant whipped Sarah with the fire-board. Witness described this chastisement substantially as Mr. and Mrs. D. G. Mercer did.

Cross-examined, the witness stated that, when he left home on the day after his father's arrest, he went to his uncle's on the Stephenson place, some four or five miles distant. He went to town to see his father within a week or two after the arrest, and had

since attempted to procure him bond.    Witness never heard his
father say anything about killing himself.    He had never heard
anything said in the family about the defendant being the father of
Sarah's child.    He never heard such a thing suggested from any
source until the Redfords moved to Valley Springs.    He heard the
parentage of Sarah's child discussed for the first time just prior to
the defendant's arrest.

Robert Mercer, the defendant's brother, testified in his behalf
that he had lived near the defendant in Washington, Lee and Llano
counties, during which time he saw a great deal of the defendant
and his family.    Defendant always appeared kind and considerate.
Sarah was sometimes a little unruly and hard to control, and gen-
erally did as she pleased.

In rebuttal, the State introduced Mrs. Loftis, the sister of Mrs.
Sarah Vaughn, and daughter of the defendant.    She testified that
Sarah's child was born in March, 1882.    She remembered the time
when the defendant got his gun, said that he was going to kill him-
self, and that Sarah ought to be willing to go to the grave with him.
She did not, however, hear the whole of the conversation, and could
not say what was then the subject of discussion.    The defendant
had always been severe and harsh with both' the witness and Sarah,
and often whipped them.    She could not say how often he had
whipped Sarah.    Witness's mother, the wife of the defendant, was,
at the time of this trial, at home, about six miles distant.

Doctor J. H. Miller, in rebuttal for the defense, testified that he
was a regular practicing physician, and had been in active practice
for forty years.    He had made obstetrics a careful study, and af-
firmed, upon medical authority and actual observation, that the usual
period of a woman's gestation is nine calendar months or two hun-
dred and seventy days.    In some cases they go beyond that period,
reaching two hundred and eighty and two hundred and ninety days.
He has known, in Texas, the period of ten and a half months to
elapse between impregnation and delivery, and gave it as his pro-
fessional opinion that a woman in this State could carry a child as
long as eleven months, and even longer.    Three hundred days is
now considered by high medical authority as a possible legitimate
period of gestation in a woman in this country.    The witness con-
sidered it highly improbable that a strong, healthy male, capable of
becoming a father, could have weekly intercourse with a strong,
healthy female between thirteen and fourteen years old, and continue
it through seven or eight years, without impregnating the female.
Where the connection is not voluntary on the part of the female

she is less likely to become pregnant, and impregnation is less likely to ensue from the copulation of relatives.

The subject-matter of the last head-note of this report is the substance of certain comments of the prosecuting counsel in his concluding argument. In substance, the State's attorney reminded the jury that the witness Sarah Vaughn testified that her father confessed his paternity of the child to his wife, threatened to kill himself, and expressed his opinion that the said Sarah ought to be willing to go with him to the grave. He reminded the jury of the fact that it was beyond the power of the State to produce the wife as a witness against her husband, but that it was within the defendant's power to produce her as a witness in his behalf, and disprove, if he could, the confession deposed to by the said Sarah. The counsel argued that the defendant's failure to produce his wife, who was accessible, was a fact corroborative of the testimony of the witness Sarah. The court overruled objections to this line of argument.

The questions discussed in the opinion of the court were presented in the motion for new trial.

*W. T. Dalrymple,* for the appellant, filed an able and exhaustive brief.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE.  I. This being a conviction for the crime of incest, it is contended that if the evidence shows that the defendant was guilty in the same transaction of the higher and distinct crime of rape, it is an illegal conviction and must be set aside. It is ingeniously and ably argued by counsel for defendant that our statute defining the offense of incest, in using the words " carnally know each other," presupposes the *consent* of both parties, and makes it necessary that they should mutually carnally know each other; that the offense will not be complete where the man only acts voluntarily in the illicit connection; but, to make the offense complete, both the man and the woman must have the carnal knowledge with each other mentally as well as bodily; that a *rape* of the woman by the man excludes the crime of *incest,* and that, *eo converso,* where *incest* is, *rape* cannot be. Counsel supports his reasoning by respectable authority. (*People* v. *Harrison,* 1 Parker's Cr. Rep. (N. Y.), 344; *Noble* v. *The State,* 22 Ohio, 43; Northwestern Reporter, April 3, 1880, p. 442.)

But, in our opinion, the great weight of reason and of authority

is against the doctrine announced in the authorities cited and contended for by counsel for defendant. Mr. Bishop says, in treating of this class of offenses: "As every offense to be punishable must be voluntary, so in particular must be adultery. But alike in adultery and, it is believed, in fornication and in incest, where the crime consists in one's unlawful carnal knowledge of another, it is immaterial whether the other participated under circumstances to incur guilt or not,— just as sodomy may be committed either with a responsible human being, or an irresponsible one, or a beast. Therefore, the same act of penetrating a woman who, for example, is too drunk to give consent, may be prosecuted either as a rape or as adultery, at the election of the prosecuting power. There are cases which deny this, and hold that adultery, fornication and incest can be committed only with consenting persons, and what is rape cannot be one of the others. But they are believed to proceed partly, and perhaps entirely, on special terms of statutes; certainly, in principle, they can have no other just foundation." (Bish. on Stat. Crimes, § 660.)

In the case of *The People* v. *Rouse*, 2 Mich. N. P., 209, it was held upon a trial for incest, where the proof tended to show that the intercourse was forcible and against the will of the female,— the complaining witness,— with whom the intercourse was had, that the accused might be convicted for incest even if the jury should find that the force used was such as, under the circumstances, to amount to rape. In *Raiford* v. *The State*, 68 Ga., 672, it was held that, in the perpetration of the crime of incest, there may be a certain force or power exerted, resulting from the age, relationship, or circumstances of the parties, which nevertheless may not amount to the violence necessary to constitute rape. In *Alonzo* v. *The State*, 15 Texas Ct. App., 378, the question now before us was discussed and the authorities reviewed at some length, the conclusion arrived at and announced being adverse to the view contended for by defendant's counsel in this case. If our view of the law as enunciated in the last cited case be correct, and we believe it is, then that case is decisive of the question we have been discussing, and accordingly we hold that, notwithstanding the evidence in this case may show that the defendant committed rape upon his daughter, he may be prosecuted and convicted for incest; and that, to make him guilty of incest, it was not necessary that his daughter should have consented to his carnal knowledge of her. She might be entirely innocent of any crime, and yet he might be guilty of rape or incest, or both, by having carnal knowledge of her. We can see nothing in our stat-

ute defining the crimes of rape and of incest which militates against this view.

II. It was entirely upon the testimony of the defendant's daughter, with whom the incestuous intercourse is alleged to have occurred, that this conviction was obtained.    It is contended by defendant's counsel that she was an accomplice in the offense, and that her testimony being uncorroborated in the manner required by law, the conviction is not sustained by sufficient evidence.    If the witness, knowingly, voluntarily, and with the same intent which actuated the defendant, united with him in the commission of the crime charged against him, she was an accomplice, and her uncorroborated testimony cannot support the conviction. (Whart. Cr. Ev., § 440; *Freeman* v. *The State*, 11 Texas Ct. App., 92.)    But if, in the commission of the incestuous act, she was the victim of force, threats, fraud or undue influence, so that she did not act voluntarily, and did not join in the commission of the act with the same intent which actuated the defendant, then she would not be an accomplice, and a conviction would stand even upon her uncorroborated testimony.    (*Watson* v. *The State*, 9 Texas Ct. App., 237; Whart. Cr. Ev., § 440.)    In his charge to the jury the learned judge very fully and correctly instructed them upon the subject of accomplice testimony, and the issue as to whether or not the prosecuting witness was an accomplice was clearly and correctly submitted for their determination.    We think the charge of the court in all respects was full, fair and correct, and there was no error committed in refusing the several special instructions requested by the defendant.

III. By far the most embarrassing question to us, which is presented in this case for our determination, is the sufficiency of the evidence to sustain the conviction.    If the prosecuting witness was not an accomplice, then the evidence is unquestionably sufficient. If, on the other hand, she *was* an accomplice, her testimony, if not corroborated to the extent required by law, is insufficient.    The first inquiry, therefore, is, does the evidence warrant the conclusion that she was *not* an accomplice?    She, herself, testifies very positively that she did not consent to the incestuous acts of her father; that she submitted to them through fear of him, under the influence of threats, etc.    But these general statements of want of consent, force, threats, etc., must be considered in connection with her other testimony, and with all the other evidence in the case.    According to her own testimony, her father, the defendant, first forced her to submit to his unnatural desire when she was thirteen years old, and he continued to have sexual intercourse with her from that time

until she was twenty years old, about once each week when he was at home, and that the last time he had such intercourse with her he impregnated her with child. During all this time she lived at home with her father, mother, sisters and brother. She was a stout, healthy girl, and at the time of testifying was a married woman and a mother. She never at any time made complaint to her mother, sisters, or to any one else of the defendant's unnatural treatment of her. It was not until she was about four and a half months advanced in pregnancy that she revealed the guilt of her father, and imputed to him the paternity of the child. She continued to reside at her father's, and even resided there with her husband after she married, and continued to reside there up to the time of the trial of this case. The last sexual intercourse which her father had with her was June 30, 1881. Her child was born March 30, 1882. She married July 26, 1883. No prosecution upon this charge was begun until March, 1884. The last sexual intercourse on June 30, 1881, she says, occurred about dark at the cow pen, where she had gone to milk the cows. The cow pen was about fifty yards from and in sight of the house, where her mother, sister and brother were at the time. She made no outcry and no resistance. To our minds her testimony, taken altogether, and in connection with the other evidence in the case, is inconsistent with the conclusion that she was not an accomplice in the commission of the offense. That this long continued incestuous intercourse, repeated almost weekly for a period of seven years, almost in the very presence of the other members of the family, could have occurred without the consent of the witness, is to our minds unnatural, unreasonable and incredible. We cannot believe it, and we do not think the jury could have grounded their verdict upon that belief.

Holding then, as we do, that she was an accomplice, our next inquiry is, is her testimony sufficiently corroborated by the other evidence in the case to warrant the verdict of the jury? Whilst the corroboration is by no means as satisfactory to our minds as we would like it to be before affirming the conviction, still we think it is legally sufficient, and, the jury being the exclusive judges of the weight of the evidence and the credibility of the witnesses, we would not feel justified in disturbing their verdict. The most material, and to our minds the only sufficient, corroboration of her testimony is that of her sister, Mrs. Loftis. The prosecuting witness testified that when she discovered she was pregnant she told her mother about it, and her mother told the defendant that witness was pregnant and that he was the father of the child, that he ac-

knowledged he was guilty, and got his gun and said he would blow his brains out, and said to the prosecuting witness that she ought to be willing to go to the grave with him. Mrs. Loftis testified that she remembered the time when her father got his gun and said he was going to kill himself, and said to her sister she ought to be willing to go to the grave with him, but that she did not hear their conversation and did not know what they were talking about. This evidence, we think, tends to connect the defendant with the offense, and fills the measure of the law. Besides this, there is some other corroborating evidence, but of so weak and uncertain a character as to be insufficient, of itself, to uphold the testimony of the accomplice witness.

IV. We do not think the remarks of the prosecuting attorney, in his closing argument to the jury, which are complained of by the defendant, were beyond the scope of legitimate argument. It was disclosed by the evidence that the defendant's wife must have known important facts bearing directly upon the issue in the case, and that she was within easy reach of the process of the court. She could have explained fully the occurrence testified about by his two daughters when he got his gun and said he would blow his brains out. She could have testified, perhaps, to many other facts which would have shed light upon this horrible transaction. It was not within the power of the prosecution to adduce her testimony; because, being the defendant's wife, she was not permitted under the law to testify against him in this case. He alone could call for her testimony, and compel its production. Her knowledge of the facts, whatever that knowledge might be, was at his command — was within his reach,— and without he produced it, or consented to its production, it was a sealed book, which no human tribunal had the power to open against him. Under these circumstances we think the prosecuting attorney was justified in the remarks complained of, and that the court did not err in its action in relation thereto.

We have found no error in the record which in our opinion demands, or would justify us in setting aside the conviction, and the judgment is therefore affirmed.

*Affirmed.*

[Opinion delivered January 31, 1885.]